# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

ESTATE OF EMILIE GRACE XIAO YING OLSEN, deceased by and through MARC AND CYNTHIA OLSEN, as Co-Administrators of the Estate, et al.

      Plaintiffs

vs

FAIRFIELD CITY SCHOOL DISTRICT BOARD OF EDUCATION, et al.

      Defendants

CASE NO.  1:15-cv-00787

Judge Michael R.  Barrett

Magistrate Judge Stephanie Bowman

**MEMORANDUM OF THE OLSEN PLAINTIFFS IN OPPOSITION TO THE FAIRFIELD SCHOOL DEFENDANTS' PARTIAL MOTION TO DISMISS SECOND AMENDED COMPLAINT**

---

## <u>TABLE OF CONTENTS</u>

I.    **Summary of Argument**..................................................................................iv-vii

- The school board is not the only policymaker under Ohio law.

- Defendants Otten, Bader, Martin, Green, Cline, Muller, and Madden should not be dismissed from this action.

- The substantive due process claim should not be dismissed because the Olsens have adequately pleaded the "state-created danger" exception.

- The Olsens have stated a claim for violations of Title VI.

- The Olsens have stated claims for liability under section 1983/*Monell*.

- Defendants are not immune from the Olsens' state law claims.

- The Olsens have stated claims for wrongful death.

- The breach of duty of care and supervision claims should not be dismissed.

- The intentional infliction of emotional distress claims should proceed against Defendants.

- Defendants are not immune from the negligent infliction of emotional distress claims.

- The Olsens have stated claims for hazing/bullying.

- The Olsens have stated breach of contract claims.

- The Olsens have stated claims for failure to report child abuse.

- The Court should not strike the allegations regarding Witnesses 1-4 and 6-10.

**II.**      **Introduction** ...................................................................................1

**III.**      **Summary of Defendants' Motion to Dismiss** ............................................ 2

**IV.**      **Argument** ................................................................................... 3

     A.      Standard of Review ............................................................... 3

     B.      The Olsens Oppose Dismissal of the Fairfield City School District ............................................... 4

     C.      The School Board is Not the Only Policymaker Under Ohio Law .................................................... 6

     D.      Defendants Otten, Bader, Martin, Green, Cline, Muller, and Madden Should Not Be Dismissed From This Action ............................... 9

         1.      Paul Otten ................................................................ 9
         2.      Candy Bader ............................................................ 10
         3.      Roger Martin ........................................................... 11
         4.      Erica Green .............................................................12
         5.      Allison Cline and Melissa Muller ....................................14
         6.      Jeff Madden ............................................................15

     E.      The Substantive Due Process Claim Should Not Be Dismissed Because the Olsens Have Adequately Pleaded the "State-Created Danger" Exception .......................... 16

     F.      The Olsens Have Stated a Claim for Violation of Title VI .......................... 23

         1.      Actual knowledge .......................................................... 23
         2.      Severe, pervasive, and objectively offensive conduct ..................... 25

ii

          3.        Deliberate Indifference ..................................................... 27

G.     The Olsens Have Stated Claims for Liability Under Section
       1983 ..............................................................................................30

H.     Defendants Are Not Immune From the Olsens'
       State Law Claims ........................................................................ 34

I.      The Olsens Have Stated a Claim for Wrongful Death ............................. 34

          1.        Emilie's Death Was Reasonably Foreseeable
                     To Defendants ........................................................ 34

          2.        The Individual Defendants are Not Immune
                     From the Olsens' Wrongful Death Claim
                     Or Their Negligence Claim ...................................... 38

J.      The Breach of Duty of Care and Supervision Claim
       Should Not Be Dismissed ........................................................... 42

K.     The Intentional Infliction of Emotional Distress
       Claim Should Proceed Against the Defendants ......................................... 43

L.      Defendants Are Not Immune From the Negligent
       Infliction of Emotional Distress Claim ..................................... 43

M.    The Olsens Have Stated a Claim for Hazing/Bullying ............................. 44

N.     The Olsens Have Stated a Breach of Contract Claim ................................. 46

O.     The Olsens Have Stated Claims For Failure To Report Child Abuse..........46

P.      The Court Should Not Strike the Allegations
       Regarding Witnesses 1-4 and 6-10 ........................................... 49

**V.**    **Conclusion** ..........................................................................51

**CERTIFICATE OF SERVICE** ..............................................................53-54

## I.     Summary of Argument

The Olsens oppose dismissal of the Fairfield City School District.  The District is a political subdivision under R. C. 2744 that is subject to the Olsens' state law claims for injury.  *Carney v. Cleveland Hts.-Univ. Hts. City Sch. Dist.*, 143 Ohio App. 3d 415, 424, 758 N.E.2d 234, 241 (2001); *Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 706 N.E.2d 1261; *Jones v. Huntington Local School Dist.* (Feb. 8, 2001), Ross App. No. 00CA2548, unreported, 2001 WL 243293; *Levenson v. Orange City School Dist.* (Mar. 20, 1997), Cuyahoga App. No. 71410, unreported, 1997 WL 127190. The District is also a "program or activity receiving Federal financial assistance" under Title VI and Title IX, and is therefore subject to the Olsens' claims under those federal statutes.  *Y. S. v. Bd. of Educ. of Mathews Local Sch. Dist.*, 766 F. Supp. 2d 839, 841–42 (N.D. Ohio 2011).

Under Ohio law, a superintendent and a principal may be a policymaker under Section 1983.  *H.M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992, 1007-08 (S.D. Ohio 2015); *Logan v. Sycamore Cmty. Sch. Bd. of Educ.*, No. 1:09-CV-00885, 2012 WL 2011037, at *6 (S.D. Ohio June 5, 2012); *Rowland v. Mad River Local Sch. Dist., Montgomery Cty., Ohio*, 730 F.2d 444, 454 (6th Cir. 1984).

The Olsens have alleged sufficient facts against Defendants Otten, Bader, Martin, Green, Cline, Muller, and Madden, such that they should not be dismissed from this action.

The Substantive Due Process Claims should not be dismissed because the Olsens have adequately pleaded the "state-created danger" exception.  Defendants' request for dismissal is premature.  *D. N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 627 (M.D. Pa. 2009).  Defendants' "act versus omission" argument attempts to make a distinction that is overly semantic.  *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013).  "Affirmative

iv

acts," under the state-created danger exception, include "actively suppressing" information regarding violation of a plaintiff's substantive due process rights. *See, e.g., D. N. ex rel. Nelson*, 608 F. Supp. 2d at 627; *Hamilton v. Spriggle*, 965 F. Supp. 2d 550, 597–99 (M.D. Pa. 2013). Defendants made affirmative decisions and engaged in affirmative actions that both created and increased the risk of harm to Emilie. (See Second Amended Complaint ("SAC"), ¶¶520-525). This Court has denied motions for judgment on the pleadings as to substantive due process claims in cases similar to the matter at bar. *Peterson v. Ne. Local Sch. Dist.,* No. 3:13CV00187, 2014 WL 2095380, at *10-11 (S.D. Ohio May 20, 2014) report and recommendation adopted, No. 3:13-CV-187, 2014 WL 4628544 (S.D. Ohio Sept. 15, 2014).

The Olsens' Title VI Claims properly allege and provide specific facts showing: (1) the harassment was sufficiently severe, pervasive, and objectively offensive; (2) Defendants had actual knowledge of the harassment; and (3) Defendants were deliberately indifferent to the harassment. Let us not forget that Emilie committed suicide as a direct and proximate result of bullying and other harassing conduct which the Fairfield School Defendants basically ignored and/or kept from her parents.

The Olsens have stated claims for liability under Section 1983/*Monell*. The Board was aware, directly and through school officials, of racial/national origin slurs and assaults against Emilie. "Actual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Barrett v. Outlet Broad., Inc.*, 22 F. Supp. 2d 726, 742 (S.D. Ohio 1997) (citation omitted). Defendants' conduct reflects their tolerance for a widespread policy, practice or custom of failing to adequately respond to bullying, sex discrimination, and race/national origin discrimination, so as to safeguard the

constitutionally protected rights of students. This policy, practice or custom was the moving force behind the violations of Emilie's rights. *See, e.g., Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 30 F. Supp. 3d 780 (C.D. Ill. 2014); *T. E. v. Pine Bush Cent. Sch. Dist.,* 58 F. Supp. 3d 332, 334  (S.D.N.Y. 2014).  Defendant are also liable for failure to train, supervise, or discipline their employees.  *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985).

Defendants are not immune from the Olsens' State Law Claims because the Olsens have adequately alleged an exception to the Individual Defendants' political subdivision immunity under R. C. §2744.03(A)(6) by alleging gross negligence and malicious purpose, bad faith, and/or wanton or reckless behavior.

The Olsens have stated claims for Wrongful Death because Emilie's death was foreseeable to Defendants and because Ohio law does not mandate that a school must know of the decedent's "intent" to commit suicide.  *Tumminello vs. Father Ryan High School, Inc.*, 678 F.App'x. 281, 288 (2017).  Defendants do not enjoy immunity because the Olsens have pleaded an exception under R. C. §2744.03(A)(6) by alleging gross negligence and malicious purpose, bad faith, and/or wanton or reckless behavior. *Galloway* I, 2012 WL 5268946, at *11; *see also*, *Mohat v. Horvath*, 11th Dist. Lake No. 2013–L–009, 2013-Ohio-4290, at ¶23.

Whether Defendants are immune from the Olsens' Breach of Duty of Care and Supervision Claims should not be decided before discovery.  The Olsens have pleaded the immunity exception under R. C. §2744.03(A)(6).  Also, discovery is required regarding whether Defendants assumed a heightened duty of care by promising and agreeing to watch over and protect Emilie.

The Intentional Infliction of Emotional Distress ("IIED") Claims should proceed against Defendants because the Olsens have pleaded the immunity exception under R. C. §2744.03(A)(6).  Also, the Individual Defendants have not challenged the IIED claim against them.

Defendants are not immune from the Negligent Infliction of Emotional Distress Claims because the Olsens pleaded the exception under R. C. §2744.03(A)(6).

The Olsens have stated claims for Hazing/Bullying because the wrongful conduct can properly be described as hazing, bullying and/or harassment.  *Golden v. Milford Exempted Vill. Sch. Bd. of Edn.*, 2009-Ohio-3418, ¶¶ 27-28 (12th Dist.); *Vinicky v. Pristas*, 163 Ohio App.3d 508, 2005-Ohio-5196, at ¶ 12 (8th Dist.); *Clark, et al. v. Fairfield City School District*, CV 2010 09 4044 (copy attached hereto as Exhibit A).

The Olsens have alleged all elements of their Breach of Contract Claims against Defendants, and alleged economic losses from the breach of contract.

The School District and School Board are not immune from the Olsens' Failure to Report Child Abuse Claims (Count XIV) because a political subdivision that has allegedly failed to perform a duty imposed by the child abuse reporting statute is not immune from liability.  *Craig v. Lima City Sch. Bd of Educ.,* 384 F. Supp. 2d 1136, 1151 (N.D. Ohio 2005); *Roe v. Planned Parenthood Sw. Ohio Region*, 2009-Ohio-2973, ¶¶ 39-40, 122 Ohio St. 3d 399, 407, 912 N.E.2d 61, 69.

The Court should not strike the allegations regarding Witnesses 1-4 and 6-10.  See Fed. R. Civ. P. 12(f).  The allegations are relevant because they show Defendants' pattern and practice - both before and after Emilie's death - of failing to properly respond to reports of bullying, harassment, and discrimination.  Most of the bullying against these Witnesses occurred before Emilie's death.

## II.     Introduction

The Motion filed by the Fairfield School Defendants is styled as a "Partial Motion To Dismiss," but more closely resembles a Motion for Summary Judgment or a Motion for Directed Verdict. It repeatedly asserts that the Olsens do not have enough facts to support their causes of action, asks the Court to assume the Olsens' facts are not true, draws inferences in favor of Defendants and against the Olsens, and requests the Court to prematurely issue rulings as a matter of law.

These standards do not apply at the pleading stage. Rather, at this stage, the Olsens' facts must be assumed to be true, all inferences must be drawn in the Olsens' favor, and the Olsens only need to plead enough facts to raise their right to relief above the speculative level.

The Olsens have met and exceeded this standard. They have filed a Second Amended Complaint that is 101 pages long and contains 711 paragraphs and 22 counts. It is the product of months of document investigation and witness interviews. It is filled with specific facts regarding the role of specific Defendants. It is bolstered by allegations drawn from numerous eyewitnesses to the bullying and discrimination against Emilie. It is supported by emails from the Olsens to the School Defendants placing them on notice of the bullying against Emilie. It is buttressed by documents from the School's own files revealing the School's knowledge of the bullying against Emilie, and by allegations from no fewer than nine other Fairfield students who were bullied and discriminated against and received no help from the School, leading some of them to cut themselves and attempt

1

suicide.  In short, the Olsens have gone above and beyond their obligation at the pleading stage.  How much more factual detail would Defendants require?

The Olsens are entitled to have their claims proceed to discovery.  As such, they request the Court to deny Defendants' Motion.

## III.    Summary of Defendants' Motion

The Fairfield School Defendants **have** moved to dismiss the following Counts. With regard to each Count, the Defendants seek dismissal as to all Defendants named in the Count, unless otherwise noted:

1. Count I:  Substantive Due Process.
2. Count II:  Title VI Race/National Origin Discrimination.
3. Counts IV, V, and VI: Section 1983/Monell Claims (seeks dismissal only as to the School Board and District, Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller and Jeff Madden).
4. Counts VIII - XV: Certain State Law Claims (based on immunity).
5. Count IX: Wrongful Death.
6. Count X: Breach of Duty of Care and Supervision.
7. Count XI: Intentional Infliction of Emotional Distress (seeks dismissal only as to the School Board and School District).
8. Count XII: Negligent Infliction of Emotional Distress.
9. Count XIII:  Hazing/Bullying.
10. Count XV:  Breach of Express and/or Implied Contract.
11. Count XIV: Failure to Report Child Abuse.
12. Each and every count asserted against Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller and Jeff Madden.

The Fairfield School Defendants **have not** moved to dismiss the following claims, and thus the Court need not address them:

1. Count III: Title IX Sex Discrimination.
2. Counts IV, V, and VI: Section 1983/Monell Claims (does not seek dismissal as to Lincoln Butts, Mark Rice, and Nancy Wasmer).
3. Count VII: Denial of Equal Protection on the Basis of Race and/or National Origin.
4. Count XI: Intentional Infliction of Emotional Distress (does not seek dismissal as to the Individual Defendants).

2

5.  Count XVIII: Loss of Consortium.
6.  Count XIX: Trespass.
7.  Count XX: IIED against Lincoln Butts.

## IV.  Argument

### A.  Standard of Review

To survive a motion to dismiss, the complaint "does not need detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), but it must present "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.  To satisfy this standard, the complaint must provide "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action."  *Id.* at 555.  The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

The Fourth Circuit has explained:

[*Twombly* and *Iqbal*] does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element. ...Rule 8(a) (2) has it right. ... That is to say, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation.

*Spencer v. Earley*, 278 F. App'x. 254, 259 (4th Cir. 2008) (internal citation and quotation omitted).

The Second Circuit has interpreted *Twombly* and *Iqbal* as follows:

[The] Supreme Court is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible plausibility standard, which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible.

*Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (internal citations omitted).

3

The Supreme Court has cautioned that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable" and chances of recovery remote. *Twombly*, 550 U.S. at 556.

When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Bloch v. Ribar*, 156 F.3d 673, 677 (6th Cir. 1998) (citations omitted).

### B.     The Olsens Oppose Dismissal of the Fairfield City School District.

"Ohio courts seem to have differing views as to whether a school district is a proper party in a lawsuit." *Y. S. v. Bd. of Educ. of Mathews Local Sch. Dist.*, 766 F. Supp. 2d 839, 841–42 (N.D. Ohio 2011).

Defendants correctly note that some Ohio courts have held that a public school district is not an entity capable of being sued. *Thompson v. Bd. of Educ.*, No. 3:12-CV-287, 2013 WL 6001626, at *3 (S.D. Ohio Nov. 12, 2013) ("Since the Dayton City Public School District is not sui juris or an entity capable of being sued, it is entitled to summary judgment.")

On the other hand, "a number of courts, as observed by the appellant, have concluded that for purposes of political subdivision tort liability under R. C. Chapter 2744, a school district, because it is a political subdivision pursuant to R. C. 2744.01(F), is subject to being sued." *Carney v. Cleveland Hts.-Univ. Hts. City Sch. Dist.*, 143 Ohio App. 3d 415, 424, 758 N.E.2d 234, 241 (2001); s*ee also, Turner v. Cent. Local School Dist.* (1999), 85 Ohio St.3d 95, 706 N.E.2d 1261 (school district sued for negligence in prescribing and following a school bus route, supervising its employees, and for letting a child student off the school bus early); *Jones v. Huntington Local School Dist.* (Feb. 8,

4

2001), Ross App. No. 00CA2548, unreported, 2001 WL 243293 (school district sued for negligence involving an automobile accident with a school bus); *Levenson v. Orange City School Dist.* (Mar. 20, 1997), Cuyahoga App. No. 71410, unreported, 1997 WL 127190 (school district sued for negligence in maintaining a school sidewalk).

Ohio's Fourth District has explained:

> We find, based upon R.C. Chapter 2744, that a school district is a legal entity subject to suit. R. C. 2744.02 provides that subject to certain statutory exceptions, 'a political subdivision is liable in damages in a civil action for injury * * * allegedly caused by an act or omission of any of its employees in connection with a governmental or proprietary function.' For purposes of R. C. Chapter 2744, a school district is a political subdivision. R. C. 2744.01(F). Therefore, pursuant to R. C. 2744.02, a school district may be liable for civil damages.  Because R. C. Chapter 2744 assumes that a civil action may be brought against a political subdivision and includes a school district within the definition of a political subdivision, a civil action may be brought against a school district.

*Jones, supra*.

An Ohio public school district qualifies as a "political subdivision" that is liable in damages in a civil action for injury.  R. C. 2744.01(F) defines a "political subdivision" or "subdivision" as "a municipal corporation, township, county, **school district**, or other body corporate and politic responsible for governmental activities in a geographic area smaller than that of the state." (Emphasis added.)

A school district may also be subject to civil liability under federal anti-discrimination statutes.  For example, the Northern District of Ohio permitted the plaintiff to sue an Ohio public school district for violation of Title VI.  *Y. S.*, 766 F. Supp. 2d at 841–42.  Title VI prohibits discrimination on the basis of race, color, or national origin by "any program or activity receiving Federal financial assistance."  *Id.*  The court

reasoned that a school district could be considered a "program or activity receiving Federal financial assistance." *Id.*

Given the above-noted authorities, the Olsens oppose dismissal of the Fairfield City School District. The District is a political subdivision under R. C. 2744 that is subject to the Olsens' state law claims for injury. The District is also a "program or activity receiving Federal financial assistance" under Title VI and Title IX, and is therefore subject to the Olsens' claims under those federal statutes.

### C. The School Board Is Not The Only Policymaker Under Ohio Law.

The Olsens agree with the Fairfield School Defendants that the question of who is a "policymaker" under Section 1983 is a question decided under Ohio law. The Olsens disagree with the School Defendants' assertion that under Ohio law, only the Board of Education — and not any individual defendant — is a "policymaker" under Section 1983.

This Court has held that school officials — such as superintendents, principals, and others — can be policymakers under appropriate circumstances, such as where policymaking authority was delegated to them, or where there was a custom of allowing such officials to make final policy decisions. *H. M. v. Bd. of Educ. of the Kings Local Sch. Dist.*, 117 F. Supp. 3d 992, 1007-08 (S.D. Ohio 2015) (holding that two principals of a public school district could be considered policymakers under Ohio law, and rejecting the argument that only a board of education is a policymaker); *Logan v. Sycamore Cmty. Sch. Bd. of Educ.,* No. 1:09-CV-00885, 2012 WL 2011037, at *6 (S.D. Ohio June 5, 2012) (under Ohio law, principal could be a final policymaker, pursuant to Section 1983, where

the principal arguably implemented the sexual harassment policy for the Board of Education and his actions in implementing the policy bound the Board).

In *Rowland v. Mad River Local Sch. Dist., Montgomery Cty., Ohio*, 730 F.2d 444, 454 (6th Cir. 1984), the Sixth Circuit, applying Ohio law, determined that "the superintendent of schools, and the school board, are school district policymakers who, beyond a doubt, formulated and executed school district policy in the discharge/nonrenewal of this teacher because of her sexual preference."

The United States Supreme Court has held that a school superintendent held "final policymaking authority in the area of employee transfers." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 738 (1989). And in *Lytle v. Carl*, 382 F.3d 978 (9th Cir.2004), an assistant superintendent was held to be the final policymaker for employee discipline.

Indeed, it is firmly established that final policy making authority may be delegated to a government official. *Kammeyer v. City of Sharonville, Ohio*, No. 1:01-CV-00649, 2006 WL 1133241, at *9-10 (S.D. Ohio Apr. 27, 2006). The idea that policymaking authority can be delegated to lower officials is intrinsic to the concept of "custom" liability under Section 1983. "Customs" are frequently generated and implemented by lower government officials.

The Second Amended Complaint sufficiently alleges that Superintendent Paul Otten, FMS Principal Lincoln Butts, and FIS Principal Jeff Madden are policymakers. It alleges that those officials held "final policy-making authority for the School District with respect to implementation of all official governmental laws, policies, regulations and procedures governing the Fairfield City Schools, including enforcement of anti-bullying,

anti-harassment, and anti-discrimination policies within the School District." (Second Amended Complaint, ¶¶ 8-10). This allegation must be assumed to be true at the pleading stage.

As in *H. M.*, it is plausible that Otten, Butts, and Madden held policymaking authority either because it was delegated to them, or because there was a practice, policy or custom of allowing them to make policy decisions. This conclusion is bolstered by the Second Amended Complaint, which alleges that: (1) there was a practice, policy or custom in the Schools and School District of failing to adequately respond and/or negligently responding to bullying, harassment, assault/battery, sexual discrimination and racial/national origin discrimination so as to safeguard the constitutionally protected rights of students (*Id.* at Counts IV-VI); and (2) that the actions and omissions of all Defendants - including Otten, Butts and Madden - reflected their toleration of this policy, practice or custom. (See, *e.g., id.* at ¶550).

In the end, the Court need not decide who is a policymaker at the pleading stage of this case. Rather, that determination should be made only after further factual development. The Supreme Court has stated that "liability of local governments under § 1983 is not an all or nothing inquiry; rather, § 1983 instruct[s] us to ask whether governmental officials are final policymakers for the local government in a particular area, or on a particular issue." *Kammeyer*, 2006 WL 1133241, at *9-10 (internal citation and quotation omitted).

**D.     Defendants Otten, Bader, Martin, Green, Cline, Muller, and Madden Should Not Be Dismissed From This Action.**

Defendants Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller, and Jeff Madden are seeking to be dismissed from this lawsuit entirely. That is, they are requesting dismissal of every count asserted against them.  The Olsens oppose this request.

**1.     Paul Otten**

To support their claims against Superintendent Paul Otten in his personal and official capacities at the pleading stage, the Olsens need not allege multiple specific incidents of Otten's knowledge of the bullying/discrimination against Emilie.  Regardless, the Olsens specifically alleged that Otten refused to meet with Witness 7's mother regarding the bullying of her daughter.  In other words, he buried his head in the sand and ignored the rampant bullying problem in his schools.

In *Galloway v. Chesapeake Union Exempted Vill. Sch. Bd. of Educ.*, No. 1:11-CV-850, 2012 WL 5268946, at *5 (S.D. Ohio Oct. 23, 2012) (hereinafter "*Galloway* I")  the student victim of bullying brought an equal protection claim against three public school supervisors (two superintendents and the principal) and three teachers in their personal capacities.  The defendants moved to dismiss the equal protection claim against them in their personal capacities. *Id.*

The District Court denied the motion.  The plaintiffs were not required to allege specific instances in which the superintendents were informed the bullying.  It was sufficient for the plaintiffs to generally allege that the superintendents "knew about the disparate treatment of Joseph Galloway by their faculty and staff, yet did nothing to

remedy the problem. The Court finds that this constitutes knowing acquiescence." *Id*. at *5. Moreover, the plaintiffs alleged that the bullying had been reported to principals, vice principals, teachers and other school officials - all of whom were under the superintendents' chain of command. *Id*. at *5.

So too here, the Olsens have alleged that Otten knew about and was deliberately indifferent to the bullying/discrimination against Emilie. Defendants' request for dismissal of all claims against him thus fails.

Further, Otten's actions and omissions should be imputed to the School Board. Given that the superintendent is the executive officer of the board of education under Ohio law, when the superintendent acts, he or she acts on behalf of the board. *Fisher v. Wellington Exempted Village Schools Bd. of Educ.*, 223 F. Supp. 2d 833, 171 Ed. Law Rep. 90 (N.D. Ohio 2001).

### 2. Candy Bader

Candy Bader, a teacher's aide at FIS, allegedly witnessed MINOR STUDENT 2 push Emilie and slap Emilie in the face in gym class. (SAC at ¶¶50-55). Yet, Bader allegedly failed to report the incident to anyone at the School. *Id.* Defendants downplay the significance of Bader's conduct and argue that her conduct cannot support liability against her. The Olsens disagree. Bader's conduct is alleged to be part of Defendants' broader pattern and practice of failing to adequately respond to bullying, discrimination, and assaults against Emilie.

Defendants also claim that the gym class assault on Emilie had nothing to do with race or gender. But in fact the assault was based on gender slurs. The Second Amended

10

Complaint alleges that the slapping occurred during an argument between Emilie and Minor Student 2 about the fake Instagram account which Minor Student 2 reportedly created. (SAC, ¶¶43-48). That Instagram account was entitled "Emilie Olsen is Gay" and made derogatory references to Emilie's perceived sexual orientation and sexual practices. *Id.* The Olsens' allegations are sufficient at the pleading stage; this is not a motion for summary judgment.

### 3.    Roger Martin

Roger Martin is allegedly the Title IX Coordinator/Administrator for the District and/or FMS/FIS. Martin's individual liability does not hinge on whether he knew of the abuse suffered by Emilie. Rather, Martin is alleged to bear individual liability because his failure to carry out his duties as Title IX coordinator/administrator lead directly and proximately to the violation of Emilie's constitutional and statutory rights and to her death.

Under federal law, a Title IX coordinator's responsibility is "to ensure the recipient's compliance with Title IX's administrative requirements."[1] According to the Title IX Resource Guide published by the U.S. Department of Education, Office for Civil Rights, a Title IX Coordinator's duties include the following:

- The coordinator "should be involved in the drafting and revision of [the school's] policies and procedures to help to ensure that they comply with the requirements of Title IX."

- The coordinator should assist in "coordinating the implementation and administration of the recipient's procedures for resolving Title IX complaints, including educating the school community on how to file a complaint alleging a

---

[1] Title IX Resource Guide, U.S. Department of Education, Office for Civil Rights, April 2015, available at http://www2.ed.gov/about/offices/list/ocr/docs/dcl-title-ix-coordinators-guide-201504.pdf.

violation of Title IX, investigating complaints, working with law enforcement when necessary, and ensuring that complaints are resolved promptly and appropriately."

- "The coordinator should also coordinate the recipient's response to all complaints involving possible sex discrimination to monitor outcomes, identify patterns, and assess effects on the campus climate."

- "The Title IX coordinator should provide training and technical assistance on school policies related to sex discrimination and develop programs, such as assemblies or college trainings, on issues related to Title IX to assist the recipient in making sure that all members of the school community, including students and staff, are aware of their rights and obligations under Title IX."

- "[T]he coordinator should regularly assess the adequacy of current training opportunities and programs and propose improvements as appropriate."

The Second Amended Complaint in this action alleges that:

- Emilie suffered sexual discrimination in violation of Title IX (Count III);

- Defendants, including Roger Martin, failed to follow their own policies and procedures regarding bullying, sexual harassment/discrimination, the student code of conduct, and other related matters (¶¶210-242);

- Defendants, including Roger Martin, failed to properly train, oversee, supervise, and discipline their officials and teachers in proper methods of responding to bullying, harassment, sexual discrimination, race/national origin discrimination, and assault/battery, and/or negligently performed these responsibilities. (Counts IV-VI); and

- Defendants' training and supervision was obviously and clearly inadequate and/or negligent. (Counts IV-VI).

Based on the allegations, and drawing all inferences in the Olsens' favor, the Olsens ask the Court to deny Defendants' request to dismiss Martin from the lawsuit.

### 4.  Erica Green

The allegations of the Second Amended Complaint support the causes of action against guidance counselor Erica Green.  Specifically, the Second Amended Complaint alleges the following regarding Green:

12

- "Yet, at the October 22, 2014 meeting between Marc Olsen and Defendants Rice and Green, the School did not inform Mr. Olsen of the cafeteria fight regarding Emilie that had occurred the day before, despite the fact that: (a) the school had direct knowledge of the fight; (b) Mark Rice was directly involved in breaking up the fight; (c) FMS was in possession of four "incident reports" from participants in the fight; (d) the bullying of Emilie was the subject of the fight, including MINOR STUDENT 1's statement that Emilie should "go kill herself"; and (e) FMS was aware of a pattern of bullying against Emilie, and was aware of Marc and Cindy Olsen's repeated request for the school to end the bullying and keep them apprised of any additional bullying." (¶145).

- "Defendants Rice and Green also failed to provide Marc Olsen any details regarding the topic of the dispute, inform him that MINOR STUDENT 1 had allegedly told Emilie to go kill herself, or discuss what FMS's response would be to the fight or to MINOR STUDENT 1's bullying of Emilie." (¶ 146).

- "Instead, at the October 22, 2014 meeting, Defendants Green and Rice told Marc Olsen that despite Emilie's complaints of bullying, FMS would not move Emilie out of the Aquarius POD, and that Emilie simply "needed to buckle down" and deal with it." (¶147).

- "Defendant Erica Green's negligence, recklessness, and gross negligence includes her failure to offer counseling and/or adequate counseling to Emilie Olsen despite requests for counseling from Marc and Cindy Olsen and despite her knowledge of the bullying and other wrongs suffered by Emilie, including her knowledge that a Fairfield student/students had told Emilie to go kill herself." (¶602; see also ¶554).

- "Defendants Green and Mark Rice were also reckless and grossly negligent in failing to report the cafeteria dispute and the "go kill yourself" statement, made by MINOR STUDENT 1, to Marc and Cindy Olsen." (¶603).

- WITNESS 3 submitted written anti-bullying reports to Greene regarding the bullying he suffered in school, but Greene conducted no investigation and took no effective action to identify and discipline those responsible.  (See ¶¶303-304).

Defendants assert that the cafeteria fight did not involve the decedent, and therefore Green's failure to tell the Olsens about the cafeteria fight does not support a cause of action against her.  Defendants are incorrect: the cafeteria fight was directly about Emilie.  According to the Second Amended Complaint, Fairfield students (believed

13

to be friends of Emilie) confronted Minor Student 1 in the cafeteria because Minor Student 1 had told Emilie to kill herself.  These students told Minor Student 1 to stop bullying Emilie.  Despite Green's knowledge of these facts, she failed to inform the Olsens about them during the October 22, 2014 meeting, or at any other time.  She also failed to offer Emilie counseling to cope with the bullying that Green knew Emile was enduring.

Defendants also downplay the significance of Green and Rice denying the Olsens' request to move Emilie out of the Aquarius POD (which contained some of Emilie's bullies).  But, drawing all inferences in the Olsens' favor, this action supports the Olsens' causes of action against Green.  It demonstrates that Green was involved with the School's decision to leave Emilie in a POD where her bullies could continue to torment her, despite Green's knowledge that Emilie might be psychologically vulnerable given the pernicious bullying directed against her.

The Second Amended Complaint shows that Green assumed a role - voluntarily or otherwise - to address the bullying against Emilie on behalf of FMS and/or the District/Board of Education in direct face-to-face meetings with the Olsens.  Having assumed that role, she cannot now claim she had no involvement in the situation.

### 5.    Allison Cline and Melissa Muller

The allegations of the Second Amended Complaint support the causes of action against Allison Cline and Melissa Muller.  Specifically, the Second Amended Complaint alleges the following regarding Cline and Muller:

- They received Marc Olsen's January 30, 2014 email reporting that Emilie was being bullied, assaulted, and discriminated against, and asking for the School's help in stopping the attacks.  (SAC, ¶57).

14

- In the days following the January 2014 email, Marc Olsen made several telephone calls to Cline and Muller to find out what was being done to "take care of the situation" involving his daughter, Emilie. (SAC, ¶59).  However, neither Cline nor Muller took responsive action.  (SAC, ¶¶60-64).

- Cline and Muller, as officials with supervisory responsibilities, implicitly authorized, approved of, or knowingly acquiesced in the unconstitutional conduct of subordinates in failing to properly respond to bullying, harassment and discrimination on the basis of race and/or national origin directed against Emilie Olsen, and thereby acted with deliberate indifference to the violation of Emilie's rights. (SAC, ¶594).

In addition, the Second Amended Complaint contains numerous allegations and causes of action alleging that all School Defendants, including Cline and Muller, violated Emilie's federal and state law rights through their deliberate indifference to the bullying. By demanding dismissal of Cline and Muller at the pleading stage, Defendants are once again seeking to impose a summary judgment standard by requiring extensive and air-tight factual allegations regarding every Defendant.  The truth is that the Olsens have met their pleading burden with regard to Cline and Muller.  They were supervisory officials with a duty to enforce discipline and anti-bullying policies, and they had actual knowledge of the bullying against Emilie.

### 6.   Jeff Madden

The allegations of the Second Amended Complaint support the causes of action against Jeff Madden.  Specifically, the Second Amended Complaint alleges that Madden was the Principal of the Fairfield Intermediate School during Emilie's attendance there, and as Principal, he was a policymaker under Section 1983.  (SAC, ¶10).  It further alleges that Emilie was bullied, assaulted, and discriminated against at FIS under his watch. (SAC, ¶¶33-69).  It also alleges that he and other Defendants created or tolerated a

15

widespread policy, practice or custom of failing to adequately respond and/or negligently responding to bullying, harassment and assault/battery, and that this policy/custom was the moving force behind the violations of Emilie's constitutional and federally protected rights.  (See SAC, Counts IV – VI).

The allegations against Madden regarding his failure to stop the bullying against Witnesses 1 and 6 are relevant because they demonstrate the very policy/custom of deliberate indifference to bullying that violated Emile's rights.  For all these reasons, Madden should not be dismissed at the pleading stage.

> **E.    The Substantive Due Process Claim Should Not Be Dismissed Because The Olsens Have Adequately Pleaded the "State-Created Danger" Exception.**

Defendants have moved to dismiss the Olsens' Substantive Due Process Claims. They contend that the Olsens have not adequately pleaded the "state created danger" exception.

The *DeShaney* rule holds that the state has no obligation to protect a private citizen against other private citizens.  See *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989).  An exception to the rule exists where the state created or increased the risk that a private citizen would be harmed by another private citizen.

To prevail on a "state-created danger" exception, a plaintiff must establish three elements:

> (1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from

16

> a risk that affects the public at large; and (3) the state knew or should
> have known that its actions specifically endangered the plaintiff.

*Molina v. Bd. of Educ. of Sch. Dist. for City of Detroit*, No. 07-10948, 2007 WL 4454928, at *6 (E.D. Mich. Dec. 14, 2007).

According to Defendants, the Olsens have only alleged "omissions" and not "affirmative actions" by the School. Defendants argue that "omissions" do not qualify as "affirmative acts" under *DeShaney* and therefore they do not establish the state created danger exception.

As an initial matter, Defendants' request for dismissal of the substantive due process claims at the pleading stage is premature. *See, e.g., D. N. ex rel. Nelson v. Snyder*, 608 F. Supp. 2d 615, 627 (M.D. Pa. 2009). Defendants are attempting to convert this into a motion for summary judgment by arguing the application of the facts to the law, as if discovery has already occurred. At the pleading stage, "a defendant is not entitled to the inference that its actions left the plaintiff no worse off than when they found him." *Vaughn v. City of Chicago*, No. 14 C 47, 2014 WL 3865838, at *2 (N.D. Ill. Aug. 5, 2014) (denying motion to dismiss substantive due process claim). "Even a marginal increase in risk is sufficient to state a plausible state-created danger claim." *Id.*

Defendants argument also "falsely assumes that the state-created danger doctrine applies only when state actors turn a safe situation into a dangerous one." *Vaughn, supra*. In reality, "the doctrine also protects individuals against marginal increases in risk - *i.e.*, placing someone who already faces danger in even greater peril." *Id.* The Court should allow discovery on the substantive due process claim. Discovery will reveal a great deal about whether Defendants' affirmatively increased the danger to Emilie.

17

Second, Defendants are attempting to make a distinction without a difference. "[T]he requirement of an actual affirmative act is not intended to turn on semantics of act and omission. Instead, the requirement serves to distinguish cases where officials might have done more from cases where officials created or increased the risk itself." *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (citation and quotations omitted), as amended (June 14, 2013). Moreover, the Sixth Circuit has recognized that "it is often difficult to differentiate between affirmative conduct and acts of omission." *Maruschak v. City of Cleveland*, No. 1:09 CV 1680, 2010 WL 2232669, at *4 (N.D. Ohio May 28, 2010) (citation omitted). For that very reason, "the Sixth Circuit has stated that for purposes of the state-created danger exception, the test for whether or not the state has engaged in an 'affirmative act' is whether or not the victim 'was safer before the state action than he was after it.'" *Maruschak* at *4 (citing *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir.2007)). And contrary to Defendants' assertion, the Olsens need not plead magic words that Emilie was "safer before the School Defendants' alleged actions and omissions than she was afterwards." (MTD, p. 13). Rather, the "safer before than after" test is a judicial doctrine designed to aid the court in determining whether the state created danger exception has been adequately established by the plaintiff's proof.

Third, this Court has denied motions to dismiss/motions for judgment on the pleadings as to substantive due process claims in cases similar to the matter at bar. For instance, in *Peterson v. Ne. Local Sch. Dist.,* No. 3:13CV00187, 2014 WL 2095380, at *10-11 (S.D. Ohio May 20, 2014) report and recommendation adopted, No. 3:13-CV-187, 2014 WL 4628544 (S.D. Ohio Sept. 15, 2014), two African-American female students in a public

school alleged that they "were subjected to a continuous malicious campaign of racial and gender based bullying, harassment, and later retaliation" by fellow students. *Id.* at *2. The plaintiffs brought a substantive due process claim against the public school district and several schools officials. They alleged, "Defendants['] actions, in failing to intervene on the behalf of the plaintiff students who were racially harassed by [Kenton Ridge H. S.] students and staff was so reprehensible that it is shocking to the conscience and violative of the right to substantive due process secured by the Fourteenth Amended to the United States Constitution...." *Id.* at *10. They contended, "Defendants violated their substantive due process rights not only by failing to protect them from racial harassment and bullying of other students, but also creating an environment where it was customary for Blacks to be harassed with impunity." *Id.*

Specifically, they alleged that the defendants failed to:

a) Take immediate and appropriate action to investigate or otherwise determine the facts underlying their complaints; b) Conduct a prompt, thorough and impartial inquiry; c) Interview [the plaintiffs], offending students, and witnesses and maintain written documentation of investigation; d) Communicate effectively with [the plaintiffs] regarding steps taken to end harassment; e) Check in with [the plaintiffs] to ensure that harassment has ceased. *Id.* at *2.

Magistrate Judge Sharon Ovington issued a report and recommendation on the defendants' motion for judgment on the pleadings. She held that plaintiffs had plausibly pleaded that defendants were deliberately indifferent to the ongoing racial harassment inflicted upon plaintiffs, even though their parents had repeatedly reported the harassment to school officials. She concluded that, assuming the complaint's allegations were true, defendants' "acts and omissions were worse than negligent and, instead, were

19

done for the purpose of injuring [plaintiffs] "in furtherance of invidious discrimination." *Id.* at *11. Accordingly, she denied defendants' motion for judgment on the pleadings as to the substantive due process claims. Judge Walter Rice adopted her report and recommendation. (See Judge Rice's Order, attached as Exhibit B).

Other federal courts have held that government officials engage in "affirmative acts," so as to satisfy the state-created danger exception, where they "actively suppresses" information regarding violation of a plaintiff's substantive due process rights. *See, e.g., D. N. ex rel. Nelson*, 608 F. Supp. 2d at 627 (police chief of township and township manager actively suppressed police officer's admission of possessing child pornography and destroyed physical evidence of that criminal conduct, which placed foster children in foreseeable danger); *Hamilton v. Spriggle*, 965 F. Supp. 2d 550, 597–99 (M.D. Pa. 2013) (school officials actively suppressed their knowledge of abuse of autistic student by, for instance, "only placing a letter in the file" regarding the abuse, telling staff that the school would not act on its' knowledge, and failing to alert the student's parents or the police).

In light of the above-cited authorities, the Olsens strongly disagree with Defendants' characterization of their conduct as "omissions" only. On the contrary, Defendants made affirmative decisions and engaged in affirmative actions that both created and increased the risk of harm to Emilie. (See SAC, ¶¶520-525).

As in *Peterson*, the Olsens have alleged that "[t]he practices, policies, or customs of Defendants have substantially contributed to and exacerbated an environment in which it was customary for students such as Emilie Olsen, and WITNESSES 1 through 4 and 6 through 10 to be bullied, harassed, assaulted/battered, and discriminated against."

(SAC, ¶523). The problem was bigger than Emilie: many students were victims of the bullying culture at Fairfield. Even when students "reported the bullying, asked for help, became desperate and attempted suicide, Defendants persisted in their custom of failing to take effective action, thereby acquiescing in the wrongful conduct." Defendants' affirmative decisions to take ineffective action, or to do nothing, in response to this chaos only emboldened the bullies and dramatically increased the risk of harm to Emilie and others. This pattern and practice reflects an affirmative choice to disregard the dangers created by the Defendants, and cannot be considered an omission.

As in *Spriggle*, the Olsens have alleged that Defendants actively suppressed their knowledge of violations of Emile's substantive due process rights. For instance, "the repeated decisions of Defendants to hide information from the Olsens about the bullying, harassment and batteries against Emilie, including the school's knowledge that MINOR STUDENT 1 had told Emilie to go kill herself in October 2014." (SAC, ¶522). Defendants also hid from Emile's parents the school cafeteria fight, the bathroom graffiti, and numerous reports from student witnesses that Emilie had been physically assaulted and racial discriminated against.

Defendants also engaged in a "repeated failure to complete reports regarding the bullying of Emilie"; "repeated refusals to investigate or discipline Emilie's bullies, or at least separate Emilie from the bullies and protect her from them, despite knowledge of the bullies' identities, despite requests from the Olsens that Emilie be separated from the bullies, and despite Defendants' knowledge that any remedial action they had taken was

21

ineffective"; and a "failure to respond to the derogatory messages about Emilie online and in the bathrooms." (SAC, ¶¶520-525).

Paragraph 525 of the Second Amended Complaint further details affirmative acts by the Defendants regarding their repeated decisions not to adequately formulate and enforce School policies, and not to adequately train and supervise employees with regard to enforcement of School policies - all of which increased the risk of danger to Emilie.

Despite these and many other allegations in the Second Amended Complaint, Defendants argue that the Second Amended Complaint contains "no allegations of any affirmative acts by any of the School Defendants [that] increased the decedent's exposure to peer harassment." (MTD, p. 13).

The Olsens have no duty to allege that "peer harassment" increased. Instead, the relevant inquiry is whether, under the totality of the circumstances, Defendants created or increased the danger of harm to Emilie. Here, Defendants increased the danger not only that peers would harass her, but that peers would assault her repeatedly, that she would suffer emotionally and psychologically, that her grades and future would suffer, and that she would inflict self-harm.

Defendants rely on *Stiles ex rel. D. S. v. Grainger County, Tenn.*, 819 F.3d 834 (6th Cir. 2016) for the proposition that "[f]ailing to punish or insufficiently punishing a student is generally not an affirmative act, and even where it is, typically does not create or increase the plaintiff's risk of harm." (MTD, pp. 12-13). But their reliance on *Stiles* is misplaced. *Stiles* was decided at the summary judgment stage, not the pleading stage. Moreover, *Stiles* did not establish a bright-line rule that failing to punish a student or

failing to enforce school policy is never an affirmative act; rather, it held that these failures are "generally" or "typically" not affirmative acts.

### F. The Olsens Have Stated a Claim For Violation of Title VI.

To set forth a Title VI claim, a plaintiff must show: (1) the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school; (2) the funding recipient had actual knowledge of the harassment; and (3) the funding recipient was deliberately indifferent to the harassment. *Peterson v. Kramer*, No. 3: 13-CV-187, 2016 WL 680828, at *9-10 (S.D. Ohio Feb. 18, 2016).

#### 1. Actual knowledge

Defendants claim that there are no allegations that school officials had actual knowledge of racial/national origin slurs made against Emilie (with the exception of the bathroom graffiti). This is incorrect. The Second Amended Complaint alleges that Witness 7 reported to Nancy Wasmer that several students shoved Emilie in the hallway, kicked her, and told her to "go kill yourself." (SAC, ¶388). Witness 7 also told Wasmer that the incident was probably captured on the school surveillance video footage. (SAC, ¶389). Wasmer, however, refused to watch the video footage. (SAC, ¶390). Wasmer's knowledge is imputed to her superiors including the Board and the District.

WITNESS 7 also demanded a meeting with Principal Butts about the assault, but Butts refused to meet with her. (SAC, ¶386). It is thus reasonable and proper to infer that Butts also had actual notice of this assault against Emilie, even if he did not sit down with

23

Witness 7 and listen to all the details. Discovery should be permitted to uncover exactly what Butts knew about the incident.

Defendants admit that the Second Amended Complaint alleges they had actual knowledge/notice of the racist bathroom graffiti slurs written on the School's bathroom walls/stalls. (SAC, ¶¶121-129). The Second Amended Complaint alleges that the racist bathroom messages were reported and/or witnessed firsthand by FIS and/or FMS teachers/administrators, including a Mrs. Brinker. *Id.* at ¶126. One of these messages was shown to Nancy Wasmer before Emilie's death. *Id.* at ¶127.

Defendants assert that there are no allegations that Emilie saw the graffiti or that she was negatively affected by it. (MTD, p. 16). However, Title VI does not require the Olsens to show that Emilie knew about the graffiti. *Peterson*, 2016 WL 680828, at *9-10. Title VI only requires that the School knew about the graffiti, and that the harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school. *Id.*

But even assuming arguendo that Emilie's knowledge of the bathroom graffiti was relevant, it is reasonable to infer that Emilie knew of the graffiti. The Second Amended Complaint alleges that the bathroom messages about Emilie were written on the walls, stalls and mirrors of the bathrooms in very large letters for all to see. (SAC, ¶¶124-126). They were placed in locations that were easily observable and could not have been missed by anyone using the restrooms, including the School administrators, teachers and other employees. *Id.* The messages remained in place for months prior to her death, beginning in approximately September 2014 and continuing until after Emilie's death in December

2014. *Id.* at ¶126. Defendants painted over the messages after Emilie's death. *Id.* at ¶129. Defendants are again drawing inferences in their own favor by asking the Court to infer that Emilie did not know of and was not harmed by the graffiti.

Defendants argue that there are no allegations that the School Board was made aware of racial/national origin slurs against Emilie. (MTD, pp. 16-17). But Paragraphs 532-533 of the Second Amended Complaint allege that the Board and District did have actual knowledge of the racial discrimination.

Defendants also had actual knowledge, prior to Emilie's death, of a pattern and practice of racial/national origin discrimination against multiple students at the Schools including Witnesses 1, 2, 7 and 8. They had actual knowledge that as a direct and proximate result of this discrimination, Witnesses 1 and 2 attempted suicide, Witness 8 attempted self-harm, and Witness 7 experienced serious emotional distress. Specifically:

1. Lincoln Butts, Jeff Madden, and "FMS administrators and guidance counselors," among others, had actual knowledge of the discrimination against Witness 1.
2. Mark Rice, Ms. Mosaic, Officer Kinkade and the Guidance Counselor had actual knowledge of the discrimination against Witness 2.
3. Nancy Wasmer had actual knowledge of the discrimination against Witness 7.
4. Nancy Wasmer, Tyna Thompson and Melissa Salyer had actual knowledge of the discrimination against Witness 8.

## 2. Severe, pervasive, and objectively offensive conduct

Defendants claim that the racial discrimination directed against Emilie does not rise to the level of severe, pervasive, and objectively offensive conduct. The label it mere name-calling, which due to Emilie's suicide, is quite offensive. Regardless, this determination should not be made at the pleading stage. Assuming the Olsens'

allegations are true and drawing all inferences in the Olsens' favor, the discrimination was severe, pervasive, and objectively offensive conduct. Moreover, Defendants cite no cases supporting their assertion that the types of discrimination inflicted on Emilie constituted mere "name calling."

In addition, Defendants ignore the fact that the racial slurs hurled at Emilie were combined with contemporaneous physical assaults. On numerous occasions, she was shoved into lockers and kicked in the hallways, and these assaults were carried out while her attackers were disparaging her race and national origin. This underscores the severity and offensiveness of the racial discrimination. The Olsens cite several cases below in Subsection 3, in which discriminatory slurs combined with physical assaults were sufficient to state a claim under federal anti-discrimination statutes, including Title VI. *See, e.g.*, *Murrell v. School District No. 1*, 186 F.3d 1238, 1243-48 (10th Cir.1999); *Vance v. Spencer County Public School Dist.*, 231 F.3d 253 (6ᵗʰ Cir. 2000); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 668-671 (2d Cir. 2012). All are further described below.

To be clear, "[d]iscrimination under Title VI is not limited to being excluded from, or denied the benefits of, a particular school program." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012). Discriminatory actions "[r]estrict an individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, financial aid, or other benefit under the school system. Educational benefits include an academic environment free from racial hostility." *Id.* (internal citation and quotation omitted). The Olsens' allegations rise to this level.

26

### 3.    Deliberate Indifference

Defendants posit that the Second Amended Complaint's allegations do not show that Defendants were deliberately indifferent to the racial/national origin discrimination inflicted on Emilie.

The Sixth Circuit has explained the deliberate indifference standard as follows (the same deliberate indifference standard applies to both Title VI and Title IX claims):

> The deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it.  A plaintiff may demonstrate a defendant's deliberate indifference to discrimination 'only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances.  A recipient need not purge its schools of actionable peer harassment or engage in particular disciplinary action to avoid Title IX liability. Furthermore, courts should not second guess the disciplinary decisions that school administrators make.
>
> However: where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.

*Patterson*, 551 F.3d at 456 (internal citation and quotation omitted).

Accordingly, "even though a school district takes some action in response to known harassment, if further harassment continues, a jury is not precluded by law from finding that the school district's response is clearly unreasonable." *Id.* at 447.  Thus, if a school district "knows that its methods of response to harassment, though effective against an individual harasser, are ineffective against persistent harassment against a single student," a genuine issue of material fact exists as to whether the district was deliberately indifferent.  *Id.*

For instance, in *Galloway*, a school district failed to show it was not deliberately indifferent as a matter of law where its "tactic of merely talking to and warning students who harassed plaintiff," with occasional investigation into "some of the more significant incidents and even eventually proactively speaking to students and teachers in an effort to prevent further incidents" did not end the persistent bullying against a student. *Galloway v. Chesapeake Union Exempted Vill. Sch. Bd. of Educ.*, No. 1:11-CV-850, Doc. # 81, p. 22 (S.D. Ohio July 21, 2014) (unpublished – a copy is attached hereto as Exhibit C) (hereinafter "Galloway II") (citing *Patterson v. Hudson Area Schools*, 551 F.3d 438, 446 (6th Cir. 2009)).

Notably, "[t]he sufficiency of a response . . . must be considered 'in light of the known circumstances,' . . . and as the 'known circumstances' change, the sufficiency of a response may also have to evolve." *Zeno*, 702 F.3d at 668. Moreover, a school's action - or inaction - can constitute deliberate indifference. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645, 119 S. Ct. 1661, 1676, 143 L. Ed. 2d 839 (1999). Thus, as the circumstances regarding the discrimination and bullying against Emilie evolved and became more and more serious, so too the Defendants should have responded with more vigilance and more effective measures.

Courts have held that deliberate indifference to student-to-student harassment has been adequately pleaded, so as to withstand a motion to dismiss, when an educational institution, after being made aware of the harassment, has failed to undertake any investigation or any other efforts in response. The following cases are illustrative:

- *Davis*, 526 U.S. at 654 ("The complaint also suggests that petitioner may be able to show both actual knowledge and deliberate indifference on the part

28

of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment.").

- *Murrell v. School District No. 1*, 186 F.3d 1238, 1243-48 (10th Cir.1999) (motion to dismiss denied and deliberate indifference allegations held to be sufficient in a Title IX case where a school allegedly knew of a male student's sexual assault against female student, but it did not inform victim's parent, did not inform law enforcement, did not investigate, and did not discipline the offending student).

- *Doe v. School Admin. Dist. No. 19*, 66 F.Supp.2d 57, 60–64 (D.Me.1999) (motion for summary judgment denied and deliberate indifference allegations held to be sufficient in Title IX case where the principal did not investigate nor confront a female teacher who was reportedly having sex with male students).

- *Vance v. Spencer County Public School Dist.*, 231 F.3d 253 (6th Cir. 2000) (school's post-trial motion for judgment as a matter of law denied and deliberate indifference found where, despite its' knowledge of verbal harassment and physical assaults by male student against female student— the school took no action whatsoever, other than talking to the offending student. Further, the school continued to use the same ineffective method of "talking to the offenders" even though the school knew it had produced no results. The school also refused to change its patently inadequate response protocols.).

- *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 668-671 (2d Cir. 2012) (school district's motion for judgment as a matter of law denied and deliberate indifference allegations found sufficient in Title VI case involving student-on-student racial slurs and physical assaults where school delayed in implementing any non-disciplinary remedial action, remedial actions were little more than "half-hearted measures," school failed to conduct adequate racial sensitivity/discrimination training for students, school knew its remedial actions were ineffective, and school ignored many signals that greater, more directed action was needed.).

Here, the Olsens have adequately pleaded deliberate indifference. The Second Amended Complaint repeatedly alleges that Defendants failed to investigate the bullying and discrimination against Emilie, that they failed to discipline her bullies, that they knew their actions were ineffective but failed to do anything about it, and more. Examples

29

proliferate, including Wasmer's failure to address the racial slurs and physical assault of Emilie reported by Witness 7. Defendants' acts and omissions in response to the discrimination were clearly unreasonable under the circumstances.

### G. The Olsens Have Stated Claims for Liability Under Section 1983.

The Olsens have asserted three counts under Section 1983 (Counts IV, V and VI). Defendants' Motion seeks dismissal of Counts IV, V, and VI only as to the Fairfield School Board and District, Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller and Jeff Madden. Defendants' Motion also does not seek dismissal of Counts IV, V, and VI as to Lincoln Butts, Mark Rice, and Nancy Wasmer.

Defendants do not explain why Counts IV and V (Section 1983 claims based on bullying and sex discrimination) should be dismissed against the School Board/District. Therefore, the Court should reject Defendants request to dismiss these claims against the School Board/District.

Defendants argue that the Olsens' Section 1983 claims against the School Board regarding race/national origin discrimination (Count VI) fails because: (1) there is no allegation that the Board was aware of racial/national origin slurs against Emilie; and (2) the Olsens' allegations do not rise to level of actionable race/national origin harassment under Title VI. (MTD, pp. 17-18).

The Olsens have addressed these points above regarding the validity of the Title VI claim. More generally, Count VI should not be dismissed as to School Board and District, Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller, and Jeff Madden because the Olsens adequately pleaded that Defendants' conduct reflects

30

their toleration of a widespread policy, practice or custom of failing to adequately respond to race/national origin discrimination so as to safeguard the constitutionally protected rights of students. And they have alleged that this policy, practice or custom was the moving force behind the violations of Emilie's constitutional and federally protected rights. *See e.g., Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, 30 F. Supp. 3d 780 (C.D. Ill. 2014) (Student's parent adequately put school district on notice of § 1983 claim against it, as required to plead *Monell* claim seeking to impose liability on district for its employees' act of enabling or even encouraging bullying and harassment of student, thus depriving student of certain civil rights, by alleging that district had widespread practice or policy of enabling or encouraging bullying and harassment.).

The Olsens note that "[a] municipal policy may be pronounced or tacit and reflected in either action or inaction." *T. E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 334 (S.D.N.Y. 2014). An "officially executed policy" is a "policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 659, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). A "custom" for purposes of *Monell* liability is a "practice [ ] of state officials so permanent and well settled as to constitute a custom or usage with the force of law.'" *Monell*, 436 U.S. at 691. A custom may exist "even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* The Sixth Circuit has held that a municipality "can be shown to have a 'custom' causing constitutional violations, even if that custom was not formally sanctioned, provided that the plaintiff offers proof of policymaking officials'

knowledge and acquiescence to the established practice." *Spears v. Ruth*, 589 F.3d 249, 256 (6th Cir. 2009).

Defendants argue that there are not sufficient facts pleaded regarding Paul Otten, Candy Bader, Roger Martin, Erica Green, Allison Cline, Melissa Muller, and Jeff Madden to support Section 1983 liability against them in Counts IV, V, and VI. However, this Court has held that "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority." *Barrett v. Outlet Broad.*, Inc., 22 F. Supp. 2d 726, 742 (S.D. Ohio 1997) (citation omitted). Here, the Olsens have alleged that Otten and Madden were policymakers and that they had actual and/or constructive knowledge of the policies/customs of failing to respond to bullying, sexual discrimination, and racial discrimination. Bader, Martin, Cline, Martin and Green are alleged to have knowledge of these policies/customs as well.

The School Board, District, Otten, Martin, and Madden are also alleged to have violated Section 1983 by virtue of deliberately indifferent training, supervision and/or discipline, and failure to adopt policies necessary to prevent constitutional violations. (See, e.g., Count VI). Defendants also failed to follow their own policies and procedures regarding bullying, sex discrimination, and race/national origin discrimination.

A municipality may be held liable for failure to train, supervise, or discipline its employees. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427, 85 L. Ed. 2d 791 (1985). To establish an unconstitutional municipal policy or custom based upon a failure to train or supervise, a plaintiff must satisfy the following three elements: (1) that

the training or supervision was inadequate for the tasks performed; (2) that the inadequacy was the result of the municipality's deliberate indifference; and (3) that the inadequacy was closely related to or actually caused the injury. The Olsens have alleged all of these predicates in the Second Amended Complaint. (See, e.g., Counts IV, V, and VI).

The court's decision in *T. E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 334 (S.D.N.Y. 2014) is illustrative. In *Pine Bush*, the plaintiff survived a motion for summary judgment on her *Monell* claim. The court found evidence that the school district had actual knowledge that the plaintiff was harassed, and that other Jewish students were harassed on the basis of their religion. The school board had actual notice that school administrators were confronting numerous instances of anti-Semitic bullying. Parents had reported the anti-Semitic harassment to the school and asked administrators to take steps to address the problem. The school district was therefore on notice of a pattern of violations related to Jewish students, they were aware of school personnel potentially mishandling the situation, and there was no evidence that administrators or the board took steps to address the harassment, monitor the administrator's response to the harassment or bullying in general, or independently investigate plaintiff's claims after the plaintiff made the school aware of the harassment.

The court also found the plaintiffs identified specific deficiencies in the district's anti-bullying training program, including, (1) failure to train employees to maintain files of harassers before middle school, (2) the lack of a policy or training requiring school personnel to document, report or address anti-Semitic graffiti in the school, (3) lack of

33

policy requiring the investigation of harassment in school; (4) lack of requirement for staff or teachers to report anti-Semitic or bias related harassment; (5) lack of a tracking system for harassment and bias incidents, and (6) lack of a policy or guidelines for how to complete a Violent and Disruptive Incident Report Under New York State Law. Accordingly, the court denied the defendant's motion for summary judgment.

The same holds true here. The Olsens have plead a failure to train, a failure to address graffiti, deficiencies in the harassment policies and procedures, a lack of a tracking system for harassment incidents, and more. Defendants' arguments fail.

**H.    Defendants Are Not Immune From The Olsens' State Law Claims.**

Defendants argue that under Ohio law, they are immune from certain of the Olsens' state law claims (Counts VII, IX, X, XI, XII, XIII, XIV, and XV). (MTD, p. 19). The Olsens disagree. Defendants are not immune from the Olsens' state law claims because the Olsens have adequately alleged an exception to Defendants' political subdivision immunity under R.C. §2744.03(A)(6) by alleging gross negligence and malicious purpose, bad faith, and/or wanton or reckless behavior. The Olsens will more fully address this point below, in connection with the Wrongful Death claim.

**I.    The Olsens Have Stated Claims for Wrongful Death.**

**1.    Emilie's Death Was Reasonably Foreseeable to Defendants.**

Defendants argue that the Olsens have failed to adequately allege that Emilie's suicide was reasonably foreseeable to them. Specifically, Defendants argue that they were not aware of any "intent" by Emilie to take her own life.

34

Defendants cite no case law holding that notice of "intent" of a student to take her own life is necessary to support a wrongful death claim, particularly at the pleading stage. Rarely will a student contemplating suicide due to bullying notify a school ahead of time of a specific intent to take her own life. Moreover, the Olsens should be allowed to take discovery on whether the Defendants had actual knowledge of Emilie's intent to commit suicide. Emilie met with school counselors and administrators on several occasions regarding the bullying she suffered, and she may have revealed a desire/intent to commit self-harm to those individuals. In addition, FMS interviewed and took written statements from several FMS students about Minor Student 1's comment to Emilie that Emilie should go kill herself. These students may have provided the school with notice that Emilie was considering self-harm.

Furthermore, the Olsens have sufficiently alleged that, under the totality of the circumstances, it was reasonably foreseeable that Emilie's suicide was a reasonably foreseeable result of Defendants' gross negligence, neglect, bullying, harassment, discrimination, and other actions and omissions of Defendants described herein. (See, e.g., SAC ¶¶ 610-617). These allegations include without limitation:

- After the bullying began, Emilie underwent a remarkable decline in academic performance and change in behavior. Before the bullying, Emilie as a straight "A" student and a personable girl, but as the bullying progressed, Emilie's grades fell significantly and her in-class performance suffered, and she became noticeably withdrawn, barely speaking a word in school and sometimes eating alone in the cafeteria.

- Defendants they were put on notice for months on end from multiple witnesses that Emilie had been bullied, assaulted/battered, harassed and discriminated against; that her behavior at home changed significantly for the worse; that her parents were very upset about the decline they saw in her and told the school that

35

the decline was linked to the bullying; and that she had been placed in counseling to deal with these issues.

- Emilie's suicide was also reasonably foreseeable to Defendants because in the months prior to Emilie's death, they knew that two other Fairfield students, WITNESSES 1 and 2 had attempted suicide and/or self harm as a direct and proximate result of bullying at Fairfield schools, and Defendants were thus well aware that suicide was a reasonably foreseeable result when a student endures bullying of the kind endured by Emilie.

Defendants also intentionally hid from Marc and Cindy Olsen that Minor Student 1 had told Emilie to kill herself and that the bathroom was filled with abusive graffiti about Emilie including statements that she should kill herself. Defendants thereby prevented Marc and Cindy Olsen from taking action to stop these abuses, and prevented the Olsens from arranging psychological counseling for Emilie to cope with these abuses. In addition, Defendants failed to offer Emilie in-school counseling to deal with these specific abuses. For these reasons, and those detailed in the Second Amended Complaint, Defendants cannot now be heard to claim that Emilie's suicide was not foreseeable. They knew or should have known that she was psychologically vulnerable to self-harm including suicide and they took no effective action to prevent it.

Defendants cite *Fischer v. Morales*, 38 Ohio App.3d 110, 526 N.E.2d 1098 (1987) for the proposition that suicide constitutes intervening force which breaks line of causation stemming from wrongful act, and therefore, wrongful act does not render defendant civilly liable, unless the suicide was reasonably foreseeable to the defendant. (MTD, p. 21). Although Defendants argue that Emilie's suicide was not reasonably foreseeable to them, the Olsens have shown above that the suicide was reasonably foreseeable to them.

Importantly, the Sixth Circuit recently held that "[i]f a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of bullying might resort to self-harm, even suicide." *Tumminello vs. Father Ryan High School, Inc.*, 678 F.App'x. 281, 288 (2017). In *Tumminello*, the school argued that the student's suicide was not reasonably foreseeable because the school did not have notice of the student's "state of mind." *Id.* The Sixth Circuit rejected this argument, holding that the standard proposed by the school is "undoubtedly too high." *Id.* It held that because of how well publicized the destructive effects of bullying are, "all school districts should realize that self-harm is a reasonably foreseeable result of bullying, without requiring specific evidence of the victim's mental state. If a school is aware of a student being bullied but does nothing to prevent the bullying, it is reasonably foreseeable that the victim of bullying might resort to self-harm, even suicide." *Id.*

The *Tumminello* court explained that in order to successfully allege that a student's suicide was foreseeable, the complaint should at least allege that the school was aware of the bullying the student experienced, and that the school had reason to believe its anti-bullying policy needs enforcement. *Id.* The Olsens' Second Amended Complaint includes these allegations and therefore adequately pleads that Emilie's suicide was not an intervening and superseding cause, breaking the chain of causation.

The *Tumminello* court also held that the proximate cause of a bullying victim's suicide is a jury question unless the jury could only conclude that the suicide was not foreseeable to the school. Because the Olsens have shown that the suicide was reasonably foreseeable to the Defendants, the Olsens have adequately pleaded proximate cause.

37

Although *Tumminello* was decided under Tennessee law, Tennessee law is virtually identical to Ohio law with regard to whether suicide constitutes an intervening cause. *See id.* at 287 (describing Tennessee law). Furthermore, several Ohio courts, including this Court, have held that summary judgment is not proper where there is a genuine issue of fact regarding whether the decedent's suicide was reasonably foreseeable to the defendant. *See, e.g., Probst v. Consol. Care, Inc.,* No. CIV. 06-594, 2008 WL 320148, at *6 (S.D. Ohio Feb. 4, 2008); *Williams v. Sweeney*, 5th Dist. Morrow No. CA-784, 1993 WL 535279, at *2 (Dec. 6, 1993). Defendants' challenge to the Olsens' wrongful death claim thus fails.

### 2. The Individual Defendants are Not Immune from The Olsens' Wrongful Death Claim or Their Negligence Claim.

A public school teacher is immune from liability (including negligence/gross negligence), unless one of the exceptions set forth in R. C. §2744.03(A) (6) applies. Those exceptions are as follows: (a) the employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; (b) the employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed upon the employee by a section of the Revised Code. *Galloway* I, 2012 WL 5268946, at *9 (citing R. C. 2744.03(A) (6)).

The School Defendants argue that the Olsens' allegation of "gross negligence" in their Wrongful Death claim (Count IX) is insufficient to state an exception to the Individual Defendants' political subdivision immunity. The Olsens disagree. Ohio courts have rejected this argument, holding that an allegation of gross negligence is sufficient to overcome a public school teacher's immunity at the motion to dismiss stage. *Galloway* I,

38

2012 WL 5268946, at *11; *see also*, *Mohat v. Horvath*, 11th Dist. Lake No. 2013–L–009, 2013-Ohio-4290, at ¶23.

A plaintiff need not expressly assert the magic words that the individual defendants acted with "malicious purpose, in bad faith, or in a wanton or reckless manner."

As the *Galloway* I Court explained:

> The Amended Complaint simply alleges "negligence and/or gross negligence." (Doc. 19 at ¶ 66). While the plaintiffs failed to include the requisite buzz words in the Amended Complaint, the plaintiffs have provided sufficient facts from which a jury could conclude that Defendants' conduct was "in bad faith, wanton and/or reckless" and fell within the exception to immunity.

*Galloway* I, 2012 WL 5268946, at *11.

The *Galloway* I Court thus denied the individual defendants' motion to dismiss as to the negligence/gross negligence claim. According to the court, the complaint placed the defendants on notice that Joseph Galloway had been repeatedly bullied, that his parents had complained to numerous school officials about the conduct, and that the defendants and failed to take any action to alleviate the situation. *Id.* This was sufficient to overcome administrators' and teacher's immunity at the motion to dismiss stage.

The same result was reached in *Mohat v. Horvath.* In *Mohat*, a 17 year-old student at Mentor High School committed suicide following months of bullying. The complaint alleged that on the day he committed suicide, another student told him in front of other students and also in front of a teacher, "Why don't you go home and shoot yourself? No one would miss you." 2013-Ohio-4290, at ¶ 4. The complaint also alleged that, prior to the plaintiff's suicide, the defendant-teacher knew or should have known that another student at the high school had committed suicide as a result of bullying. *Id.* at ¶ 5.

39

The student's parents brought suit against the teacher in whose class the bullying had occurred.  They alleged that, despite the teacher's knowledge that the student was being regularly bullied and harassed, he did nothing to stop it and never reported the bullying to school officials.  The plaintiffs alleged negligence and/or gross negligence (Count I) and that the teacher's conduct was committed with malice, in bad faith, and was wanton and reckless (Count II).  *Id.* at ¶ 7.

Like the School Defendants in the case at bar, the teacher in *Mohat* argued that the plaintiff's "gross negligence" allegation was insufficient to overcome his political subdivision immunity.  The court disagreed, holding that gross negligence is not an ordinary negligence claim.  *Id.* at ¶23.  Gross negligence is defined as (and therefore implies) wanton and reckless behavior.  *Id.*  In addition, the plaintiffs also alleged elsewhere in the complaint that the teacher's actions were malicious, in bad faith, and were wanton and reckless.  *Id.* at ¶24.

The trial court thus denied the teacher's motion to dismiss the complaint, and the Eleventh District affirmed the ruling.  The Eleventh District found the following allegations sufficient to overcome the motion to dismiss:  (1) that the bullied student was subjected to repeated verbal and physical bullying and harassment by other students in the teacher's class; (2) that the teacher knew about the bullying not only because it occurred in his class but also because the student complained to the teacher about it; and (3) that the teacher did nothing to stop the bullying and never notified school officials about the bullying.  *Id.* at ¶ 32.

40

Other victims of bullying have also overcome motions to dismiss with allegations of negligence/gross negligence against their public school teachers. *See, e.g., Piispanen v. Carter*, 11th Dist. Lake No.2005–L–133, 2006–Ohio–2382 (denying motion to dismiss, which had asserted that principal was immune from negligence claim, because plaintiff-student alleged she was assaulted by another student on school property, and that the principal engaged in willful and wanton misconduct by negligently failing to provide a safe environment); *Shively v. Green Local School Dist. Bd. of Educ.*, 2013 WL 774643 (N.D. Ohio Feb. 28, 2012) (denying motion to dismiss, which asserted that individual defendants were immune from negligence claim, because the plaintiff alleged the defendants acted wantonly and/or recklessly in repeated failing to exercise care in dealing with religious-based bullying of student).

More generally, at the motion to dismiss stage, a plaintiff "[does] not need to show with great specificity how each Defendant contributed to the alleged violations; rather, the plaintiffs must only state allegations generally so as to provide notice as to the nature of the injury." *Galloway* I, at *10 (citation omitted). "[A] plaintiff is not required to affirmatively demonstrate an exception to immunity at the pleading stage because that would require the plaintiff to overcome a motion for summary judgment in his complaint." *Mohat*, 2013-Ohio-4290, at ¶ 29. "Instead, a plaintiff is only required to allege a set of facts, which, if proven, would plausibly allow him to recover." *Id.* Moreover, "the question of whether behavior constitutes reckless or wanton conduct so as to fall within the exception to statutory immunity is ordinarily a factual question for the jury to decide." *Galloway* II, pp. 23-24 (citing *Alexander v. Lawrence Cty. Bd. of Developmental*

41

*Disabilities*, No. 1:10-CV-697, 2012 WL 831769, at \*12 (Mar. 12, 2012) (further citation omitted)); *accord*, *Mohat*, 2013-Ohio-4290, at ¶ 22. "Therefore, in order to grant a motion to dismiss under Ohio Rev. Code § 2744.03(A)(6), the pleadings must be 'devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly.'" *Galloway* II, at \*10 (citation omitted).

As in *Galloway*, *Mohat*, and other Ohio cases in accord, the Olsens adequately alleged a wrongful death claim against the Individual Defendants. The Olsens were not required to use the magic words "wanton" or "reckless" in the Wrongful Death claim. "Gross negligence" was sufficient. Moreover, as in *Mohat*, the Olsens alleged repeatedly throughout the Second Amended Complaint that the Individual Defendants acted wantonly, recklessly, maliciously, and in bad faith. (See Second Amended Complaint, ¶¶519, 553, 566, 579, 598-607, 627, 639). Further, the 100-page Second Amended Complaint contains numerous allegations placing the Individual Defendants on notice of the claims against them and the basis for overcoming their immunity.

For all the same reasons, the Defendants are not immune from the Olsens' wrongful death claim or their negligence claim.

### J. The Breach of Duty of Care and Supervision Claim Should Not Be Dismissed

Whether Defendants are immune from the Olsens' Breach of Duty of Care and Supervision Claims should not be decided before discovery. In particular, discovery is required with regard to the Olsens' argument that: (1) Defendants entered into a special relationship, and assumed a heightened duty of care by promising and agreeing, with Emilie and the Olsens that they would exercise added vigilance over Emilie, ensure that

42

she was protected, and offer her support, guidance, and counseling; and (2) Defendants voluntarily assumed a duty of care to ensure that Emilie and all FIS and FMS students were protected from bullying, harassment, discrimination, assault and battery by adopting anti-bullying, anti-harassment, anti-discrimination, and anti-assault/battery policies.

The Olsens have also pleaded an exception to Defendants' political subdivision immunity by alleging that Defendants acted with malicious purpose, in bad faith, wantonly and recklessly in violation of Ohio Revised Code Section 2744.03(A) (6).

### K. The Intentional Infliction of Emotional Distress Claim Should Proceed Against the Defendants.

The Intentional Infliction of Emotional Distress Claim should proceed against Defendants because the Olsens have pleaded the immunity exception under R. C. §2744.03(A) (6) for malicious purpose, bad faith, wanton and reckless conduct. Also, the Individual Defendants have not challenged the IIED claim against them. Accordingly, the IIED claim against the Defendants should proceed. *See, e.g., Clark, et al. v. Fairfield City School District*, CV 2010 09 4044, Butler County Court of Common Pleas, Feb. 22, 2011 (unpublished) (see Exhibit A attached) (denying teachers/administrators' motion for judgment on the pleadings as to the IIED claim).

### L. Defendants Are Not Immune From The Negligent Infliction of Emotional Distress Claim.

Defendants posit that the Negligent Infliction of Emotional Distress ("NIED") claims are simple negligence claims for which they have immunity. They claim that there are no allegations of recklessness, or wanton or willful misconduct. This is inaccurate.

Paragraph 627 of the Second Amended Complaint alleges "Defendants' actions and omissions were carried out in a bad faith, malicious, reckless and/or wanton manner." As explained above, this allegation is sufficient to overcome the subdivision immunity of the Defendants at the pleading stage.

### M.  The Olsens Have Stated a Claim for Hazing/Bullying.

Although there is a split in authority on the issue, some Ohio courts have held that the Olsens have stated claims under the hazing statute where the wrongful conduct can properly be described as hazing, bullying and/or harassment.

For instance, in *Golden v. Milford Exempted Vill. Sch. Bd. of Edn.*, 2009-Ohio-3418, ¶¶ 27-28 (12th Dist.), the court denied a school board's motion for judgment on the pleadings on the plaintiff's hazing claim where student alleged he was assaulted and bullied while he was a member of the ninth grade boys' basketball team. The complaint overcame defendants' claim of immunity, the court held, because it alleged that the basketball coach "contributed to and encouraged a pattern of hazing and bullying activities which eventually led to the assault on [the student]." *Id.* at ¶36. The trial court found that "[e]ncouragement of and contribution to hazing among the members of a student organization is not within the discretion of any school employee or official." *Id.* The court thus denied defendants' motion for judgment on the pleadings. The decision was affirmed on appeal.

*See also, Vinicky v. Pristas,* 163 Ohio App.3d 508, 2005-Ohio-5196, at ¶ 12 (8th Dist.) (denying defendants' motion for judgment on the pleadings where the complaint alleged that a sexual attack occurred on school grounds during a school event or activity

that was inadequately monitored, and further alleging that the attack was a "hazing activity").

Another example is *Clark, et al. v. Fairfield City School District*, CV 2010 09 4044 (see Exhibit A attached). In *Clark*, the trial court denied the defendants' motion to dismiss the plaintiff's hazing claim. The court's holding was that the plaintiffs had stated a cause of action for hazing because they alleged that the school and its employees participated in hazing/bullying the student-victim, and allowed her to be subjected to hazing/bullying at the hands of others. The Olsens also alleged that the school failed to properly establish a policy prohibiting harassment, intimidation or bullying.

The court also held that school was not immune from the hazing claim because the school was under a mandatory, not discretionary duty to create and enforce anti-hazing and anti-bullying standards. In support of its ruling, the court cited R. C. 3313.666(B) which requires the board of education to establish an anti-bullying policy, and R. C. 3313.534 which requires the board to adopt a zero tolerance policy for violent, disruptive, or inappropriate behavior and establish strategies to address the behavior.

As these decisions reflect, initiation into a student organization has not been strictly required by Ohio courts to support a hazing/bullying claim.

Here, the Olsens have alleged that Emilie Olsen was subjected to hazing, bullying, intimidation and harassment as a student in the District during school hours and during school sanctioned events; that the school had a mandatory duty to create and enforce anti-bullying, anti-hazing, and anti-harassment standards pursuant to Ohio R. C. § 2307.44, §3313.666(B), and § 3313.534; and that Defendants failed to create and enforce such

standards.  In accord with the above-noted authorities, the Olsens have stated a claim for hazing/bullying.

**N.      The Olsens Have Stated Breach of Contract Claims.**

The Olsens formed an agreement with Defendants for Emilie to attend Fairfield schools, and for these schools to educate, supervise and otherwise care for Emilie Olsen. The agreement was contractual in nature.  The Olsens signed various school documents and issued certain payments as part of the enrollment process, and/or throughout the course of the school year, agreeing among other things to Emilie's attendance.   The agreement also included Defendants' published policies, protocols and procedures upon which Emilie relied for supervision, care, and protection.  The agreement was supported by consideration in that the Olsens paid fees, costs, property taxes, and other funds to Defendants.

Contrary to Defendants' argument, the Olsens have alleged economic losses from the breach of contract. The Olsens have demanded compensatory damages, which includes their economic losses including funeral and burial expenses and Emilie's lost earning capacity.

Defendants assert that the contract was not approved at a meeting of the School Board, but this is a matter for discovery.  Dismissal of the breach of contract claims would be premature.

**O.      The Olsens Have Stated Claims For Failure To Report Child
            Abuse.**

Defendants argue that that the School Board is immune from liability for the Olsens' Claim for failure to report child abuse (Count XIV).  They contend that because

the child abuse statute does not explicitly list a school board, a political subdivision, or a school district among those who have a duty to report child abuse, this indicates the Legislature did not intend for the child abuse statute to vitiate the immunity of those entities. (MTD, pp. 26-27).

Ohio's statute on reporting child abuse and neglect, R.C. 2151.421, requires certain persons to report suspected child abuse or neglect to the proper authorities. The statute provides, in relevant part:

> (a) No person described in division (A)(1)(b) of this section who is acting in an official or professional capacity and knows, or has reasonable cause to suspect based on facts that would cause a reasonable person in a similar position to suspect, that a child under eighteen years of age or a mentally retarded, developmentally disabled, or physically impaired child under twenty-one years of age has suffered or faces a threat of suffering any physical or mental wound, injury, disability, or condition of a nature that reasonably indicates abuse or neglect of the child shall fail to immediately report that knowledge or reasonable cause to suspect to the entity or persons specified in this division. Except as provided in section 5120.173 of the Revised Code, the person making the report shall make it to the public children services agency or a municipal or county peace officer in the county in which the child resides or in which the abuse or neglect is occurring or has occurred. In the circumstances described in section 5120.173 of the Revised Code, the person making the report shall make it to the entity specified in that section.

R.C. 2151.421(A)(1)(a).

The statute imposes liability on a person who violates his or her duty to report child abuse or neglect under Section (A) of the statute:

> (M) Whoever violates division (A) of this section is liable for compensatory and exemplary damages to the child who would have been the subject of the report that was not made. A person who brings a civil action or proceeding pursuant to this division against a person who is alleged to have violated division (A)(1) of this section

47

> may use in the action or proceeding reports of other incidents of known or suspected abuse or neglect, provided that any information in a report that would identify the child who is the subject of the report or the maker of the report, if the maker is not the defendant or an agent or employee of the defendant, has been redacted.

R.C. 2151.421(M).

Ohio courts have held that a political subdivision that has allegedly failed to perform a duty imposed by the child abuse reporting statute is not immune from liability. *Craig v. Lima City Sch. Bd of Educ.,* 384 F. Supp. 2d 1136, 1151 (N.D. Ohio 2005) ("In [*Campbell v. Burton*], the Court further clarified that the political subdivision could be held liable for its employee's failure to perform the duty imposed by § 2151.421. Accordingly, there is potential for liability under these claims if plaintiff establishes that, indeed, an employee of the Board actually failed to report [suspected child abuse]."); *Roe v. Planned Parenthood Sw. Ohio Region*, 2009-Ohio-2973, ¶¶ 39-40, 122 Ohio St. 3d 399, 407, 912 N.E.2d 61, 69 ("In *Campbell v. Burton*, this court broadly construed the word 'liability' in R.C. 2744.02(B)(5) and 2744.03(A)(6)(c) and determined that a political subdivision and its employee could not claim immunity from liability under the Political Subdivision Tort Liability Act for the failure to perform a duty imposed by R.C. 2151.421. *Campbell* held that a political subdivision and its employee may be held liable for a violation of R.C. 2151.421....").

The Second Amended Complaint alleges that Defendants knew or had reasonable cause to suspect that Emilie suffered or faced a threat of suffering a physical or mental wound, injury, or disability, to wit: that Emilie had been physically assaulted/battered, bullied, harassed and discriminated against, that she was likely to physically harm herself and was a risk to commit suicide, among other things. It further alleges that pursuant to

48

Ohio R.C. § 2151.421, Defendants had a duty to report that they knew or had reasonable cause to suspect that Emilie suffered or faced a threat of suffering a physical or mental wound, injury, or disability, and that they breached their duty when they failed to report as required by Ohio R.C. § 2151.421.

Accordingly, Defendants are not immune from liability under the child abuse reporting statute, and thus their challenge to the Olsens' claim fails.

### P. The Court Should Not Strike the Allegations Regarding Witnesses 1-4 and 6-10.

Defendants move to strike the allegations regarding Witnesses 1-10 for two reasons: (1) they posit that the Second Amended Complaint contains allegations that occurred after the suicide of Emilie and that these allegations are not relevant; and (2) they argue that other allegations regarding these Witnesses have "no connection" to the Plaintiffs' claims.

First, the only mechanism to strike the allegations is Fed. R. Civ. P. 12(f). Rule 12(f) provides in relevant part that a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Crosky v. Ohio Dep't of Rehab. & Corr.*, No. 2:09-CV-00400, 2010 WL 1610818, at *1 (S.D. Ohio Apr. 20, 2010). There is nothing redundant, immaterial, impertinent, or scandalous about the allegations regarding Witnesses 1-4 and 6-10.

Second, the allegations are relevant because they show Defendants' pattern and practice of failing to properly respond to reports of bullying, harassment, and discrimination. (See numerous cases cited in Plaintiffs' Motion to Compel Discovery from the School Defendants Regarding the Minor Fairfield Students, which establish that

49

pattern-and-practice claims allegations are relevant and necessary to support Section 1983 claims, equal protection claims, and claims under Title IX and Title VI). Witnesses 1-4 and 6-10, all of whom were Fairfield students, were bullied, harassed and discriminated against, with the actual knowledge of the Defendants, and Defendants failed to appropriately respond to end those practices and protect the victims. For this reason, it does not matter whether the students who bullied Witnesses 1-4 and 6-10 were the same students who bullied Emilie. And even if it did matter, the Olsens should be entitled to take discovery on the issue.

Third, most of the bullying against these Witnesses occurred before Emilie's death. And, if there is any doubt about whether certain incidents occurred before or after Emilie's death, the Court must draw all inferences in favor of the Olsens at this stage.

Fourth, the events after Emilie's death are also relevant because they reflect the Defendants' continuing pattern and practice of negligently responding to bullying of Fairfield Students. It was "business as usual" at Fairfield Schools even after Emilie committed suicide.

Fifth, it does not matter that some of the Witnesses were not Asian or Chinese like Emilie. The point is that they were bullied because of their race, whether they were African-American, Caucasian, or any other race. Likewise, it does not matter that Witness 3 was male. He was bullied because of his gender and his perceived sexual orientation as gay, just as Emilie was bullied/discriminated against because of her gender and perceived sexual orientation.

Sixth, the Olsens disagree with Defendants' arguments regarding specific Witnesses:

1. <u>Witness 1:</u>  it does not matter whether Defendants knew of her "intent" to commit suicide.  The Olsens have addressed the irrelevance of "intent" to commit suicide above in the Wrongful Death section.

2. <u>Witness 4:</u>  Witness 4, an Asian-American female student, was physically assaulted because of her race/national origin by the same student who physically assaulted Emilie due to Emilie's race/national origin: Minor Student 4.  Once again, the Defendants were negligent in their response to the assault, even though Witness 4 sustained a concussion.  This again shows a continuing pattern and practice of gross negligence in responding to incidents of bullying, battery, and racially based harassment, even after Emilie's death.

3. <u>Witness 6:</u>  Defendants posit that "[t]he bulk of Witness 6's allegations concern alleged bullying after the date of the decedent's suicide. Specifically, Paragraphs 347-361 of the Second Amended Complaint concern incidents long after the death of the decedent and have no connection to the decedent or the claims of the Plaintiffs." (MTD, p. 29).  This is incorrect.  The events occurred between September 2014 and January 2016.  (SAC, ¶346).  Emilie died on December 11, 2015.  Thus, most of the events occurred before Emilie's death.  Again, any inferences about the timing of these events should be drawn in the Olsens' favor.

4. <u>Witness 7:</u>  Defendants claim that the allegations concerning Witness 7 "refer" to events after Emilie's death.  But the Second Amended Complaint alleges that Witness 7 "was bullied by Fairfield Middle School students before and after Emilie's death." (SAC, ¶366).

5. <u>Witness 8:</u>  as with Witness 7, the allegations concerning Witness 8 concern events both before and after Emilie's death.

6. <u>Witness 10:</u>  Defendants argue that Witness 10's allegations concern events that occurred after the death of Emilie. (MTD, p. 30).  This is incorrect.  The Olsens' alleged that the events began "in at least the 2015-2016 school year."  This encompasses the fall 2015 semester before Emilie died.

## V.   Conclusion

For the reasons set forth hereinabove, the Olsens request the Court to deny the Fairfield School Defendants' Partial Motion To Dismiss in its entirety.

Respectfully submitted,


**/s/ Ryan J. Dwyer**
Peter L. Ney (0039284)
Ryan J. Dwyer (0091761)
RENDIGS, FRY, KIELY & DENNIS, LLP
600 Vine Street, Suite 2650
Cincinnati, Ohio 45202
PH:    513 381 9200
FX:    513 381 9206
EM:    pney@rendigs.com
EM:    rdwyer@rendigs.com
*Trial Attorneys for Plaintiffs*

52

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing has been served by email and/or ordinary U.S. Mail, postage prepaid, upon the following this _____ day of November, 2017:

Bernard W. Wharton, Esq. (0063487)
R. Gary Winters, Esq. (0018680)
McCaslin, Imbus & McCaslin
632 Vine Street, Suite 900
Cincinnati, OH  45202
PH:     513-421-4646
FX:     513-421-7929
EM:     bwwharton@mimlaw.com
EM:     rgwinters@mimlaw.com
*Trial Attorneys for Defendants, Fairfield City School District Board Of Education, Fairfield City School District, Paul Otten, Lincoln Butts, Jeff Madden, Mark Rice, Allison Cline, Melissa (Missy) Muller, Nancy Wasmer, Erica Green, Candy Bader, and Roger Martin*

Daniel J. Knecht, Esq. (0086463)
Graydon Head & Ritchey LLP
312 Walnut Street, Suite 1800
Cincinnati, OH  45202-4060
PH:     513-629-2764
FX:     513-651-3836
EM:     dknecht@graydon.law
*Trial Attorney for Minor Student 1*

James E. Burke, Esq.
Darcy A. Watt, Esq.
Sarah V. Geiger, Esq.
Keating Muething & Klekamp PLL
One East Fourth Street, Suite 1400
Cincinnati, OH  45202
PH:     513-579-6400
FX:     513-579-6457
EM:     jburke@kmklaw.com
EM:     dwatt@kmklaw.com
EM:     sgeiger@kmklaw.com
*Trial Attorneys for Minor Student 2*

Timothy P. Heather, Esq. (0002776)
R. David Weber, Esq. (0090900)
Benjamin, Yocum & Heather, LLC
The American Book Building
300 Pike Street, Suite 500
Cincinnati, OH  45202-4222
PH:     513-721-5672
FX:     513-562-4388
EM:     tpheather@byhlaw.com
EM:     rdweber@byhlaw.com
*Trial Attorney for Minor Student 3*

K. Roger Schoeni, Esq. (0004812)
Kohnen& Patton LLP
201 E. Fifth Street, Suite 800
Cincinnati, OH  45202
PH:     513-381-0656
FX:     513-381-5823
EM:     rschoeni@kplaw.com
*Trial Attorney for Minor Student 4*

David S. Washington, Jr. (0055406)
Washington Law Offices
306 S. Third Street
Hamilton, OH  45011
PH:     513-751-1400
FX:     513-751-0089
EM:     dswlawoffices@yahoo.com
*Personal Attorney for Minor Student 4*

Stephen Yeager, Esq.
Patsfall Yeager & Pflum LLC
205 West Fourth Street, Suite 1280
Cincinnati, OH  45202
PH:     513-721-4500
FX:     513-639-7554
EM:     syeager@pyplaw.com
*Trial Attorney for Minor Student 5*

Joseph V. Erwin, Esq. (0052070)
Marshall W. Guerin, Esq. (0059244)
Law Offices of Joseph V. Erwin
P. O. Box 258829
Oklahoma City, OK 73125-8829
PH:    614-734-3280
FX:    614-799-3251
EM:    joseph.erwin@farmersinsurance.com
EM:    marshall.guerin@farmersinsurance.com
*Trial Attorneys for Minor Student 6*

**/s/ Ryan J. Dwyer**
_____
Ryan J. Dwyer

1746218